In the Matter of the Judicial Settlement of the Account of Proceedings of CENTRAL HANOVER BANK AND TRUST COMPANY, as Trustee of the Trust for WILLIAM H. FLINT under the Last Will and Testament of ADELE E. FLINT, Deceased.*

CENTRAL HANOVER BANK AND TRUST COMPANY, Individually and as Trustee, etc., of ADELE E. FLINT, Deceased, Appellant; WILLIAM H. FLINT and Others, Respondents.

Second Department, February 9, 1934.

*Albert Stickney* [*William G. Barr* and *Albert B. Maginnes* with him on the brief], for the appellant.

*Herbert P. Queal* [*John A. V. Murphy* with him on the brief], for the respondents The National Iron Bank and Edward J. Storb, as trustees, etc., and T. Edmund Wills.

*Edward J. Wren*, for the respondent Helen Croner, assignee.

CARSWELL, J. Adele E. Flint died September 19, 1920. Her will was probated January 7, 1921. She gave one-tenth of her residuary estate to the Central Union Trust Company in trust for her nephew, William H. Flint, until he was forty-five years of age. He was to receive semi-annual payments of income. When the trust period ended, the trustee was " to transfer and deliver to him the principal of the said share." Flint was born December 9,

1887, and on December 9, 1932, was forty-five years old. Decedent also provided that the trustee might retain any investments in its discretion and might reinvest " in such manner as said * * * Trustee shall deem wise, without being restricted to the class of investments which alone an Executor or Trustee is authorized by law to make."

The trustee administered the fund, and its accountings of December 16, 1932, and January 6, 1933, covering up to January 4, 1933, are here. On May 19, 1933, and June 16, 1933, objections were filed by Flint and by assignees of Flint entitled to the bulk of the fund. The surrogate has surcharged the trustee $41,457.17 and certain specified interest items to cover all the investments of this trust fund. The corporate trustee appeals.

The surrogate seems to have held that the investment in mortgage participations with varying maturities, two or more of which had a due date beyond December 9, 1932, was imprudent; that they were of a speculative character and, therefore, under his view of subdivision 7 of section 188 of the Banking Law, the trustee held the funds " at its sole risk," and was in effect a guarantor. The propriety of his ruling depends chiefly upon the soundness of his interpretation of that statute.

Two questions are presented: (1) Did the corporate trustee by investing in these securities become a guarantor under the statute? (2) If not, was its conduct imprudent and negligent?

It is necessary to outline the method of administration and depict the state of the trust fund when the trustee accounted.

The trust company, administering various estates and trust funds having cash for investment, would loan on first mortgage bonds sums equal to the aggregate of funds awaiting investment. When a loan was made, the security was received by the trust company in its own name. It would allot to each estate or trust fund a participation in the security equal to the amount contributed by each fund. It would issue to each fund a certificate of participation in the security and do other acts required of it under subdivision 7 of section 188 of the Banking Law. Before such loans were made, the application and the property would be examined by the real estate department of the trust company and then reviewed by a real estate committee composed of its officials familiar with mortgage investments.

The mortgage participations would pass from one trust fund to another as a particular fund was closed out or as a particular fund needed a new investment. The actual market for the participations was the trust company's operations. There was always a means of transferring from one fund to another until the latter part of

1931. There is no claim that the trustee profited at the expense of the beneficiaries in thus investing. There is no evidence of bad faith, and the court so found. The corporate trustee claims this conduct was authorized by the statute.

The present state of the trust is shown by trustee's Exhibit I, attached to the account, as supplemented by evidence. There are twelve items as of January 20, 1933. The original purchases began in November, 1921, and continued to May 4, 1931. Seven purchases were between 1921 and 1925; one in November, 1929; three in 1930 and one on May 4, 1931. The maturity dates were, one in 1935; two in 1934, seven in 1933; one in 1932 and one in 1928. Some were the result of extensions, the last date of extension being August 5, 1931. One or more items were open mortgages. The amounts range from $250 up to $14,600 — the latter being two items of $10,000 and $4,600. All of the items were matured in fact when the accounting was filed, with the exception of two; some as a consequence of being foreclosed because of defaults, although their nominal maturity dates were later — others maturing naturally.

The items which did not mature by either method before January, 1933, were item G for $4,000, maturing May 1, 1934, purchased November 26, 1929, and item J for $1,000, purchased February 13, 1930, due December 15, 1935. The total of these was $5,000. The percentage to appraised value of the total mortgage affecting each item was as low as twenty-seven per cent on one and between fifty per cent and sixty per cent on the others, one being sixty per cent.

The corporate trustee preferred these mortgages (against which it issued participations) to guaranteed mortgages because of its greater familiarity with the security and because of faith in its own appraisals. Funds available for investment were always greater, until recently, than the supply of mortgages. The small amounts in each fund made it impracticable to place them in individual mortgages; hence the resort to mortgage participations.

When the time came to turn over the trust fund to Flint under the accounting of January, 1933, the securities in it were not salable and the trustee desired Flint and his assignees to take the securities in which the funds were invested. All of the securities, except two items aggregating $5,000, were due but not collectible. Two were in foreclosure and two were participations in property that had been foreclosed.

The propriety of investing trust funds in real estate mortgage securities was early approved (*King* v. *Talbot*, 40 N. Y. 76, 83), even in the absence of statute. The combining by a trustee of

two sets of funds in one mortgage was held not to be a breach of trust or a violation of duty. (*Barry* v. *Lambert*, 98 N. Y. 300; *Matter of Union Trust Company* [*Hoffman Estate*], 219 id. 514.) In so doing, however, it was assumed that a trustee would not deal with himself in making such investments; and the stern doctrine still obtained, that if he did so the disclosure would result in a setting aside of the transaction, and inquiry into the fairness or unfairness of it would not be made. This in order that the " rule of undivided loyalty " might be maintained against the " disintegrating erosion " of particular exceptions. (*Wendt* v. *Fischer*, 243 N. Y. 439, 444; *Meinhard* v. *Salmon*, 249 id. 458.) This is still the law, *except in so far as changed by statute.*

When the *Union Trust Company* case was decided in 1916, the court criticised certain acts of the trustee. There then followed, in 1917, an amendment of subdivision 7 of section 188 of the Banking Law. This amendment added a new sentence, which authorized a corporate trustee to invest trust funds in mortgage participations and prescribed the manner in which it should be done. The trustee herein claims it conformed to this statutory procedure. That amendment met some of the court's criticism in the *Union Trust Company* case. It also enlarged the powers of the corporate trustee so as to permit it *to deal with itself* under certain restrictions. But it is claimed that, in the event a loss ensued, the corporate trustee had recourse to that new provision, " at its sole risk." That phrase was in the first sentence of subdivision 7 before, and was re-enacted when the amendment was had authorizing mortgage participation investments by a corporate trustee.

The history of the section's predecessor enactments will shed light on the true effect of that phrase.

In 1887, statutory provision was made for the organization of trust companies, their supervision and administration. (Laws of 1887, chap. 546.) Section 26 read: " No bond or other collateral security shall be required from the company for or in respect to any trust, nor when appointed guardian, receiver, depositary or executor or administrator, with or without the will annexed, or such committee as aforesaid, but all investments of moneys received by the said company in either of such characters, *shall be at the sole risk* of the said corporation; and for all losses of such money the capital stock, property and effects of the said corporation shall be absolutely liable."

Here first appears the phrase " shall be at the sole risk." The plain purpose of the section was to authorize a trust company to act as trustee without furnishing a bond (as does an individual trustee) and substituting therefor a declaration — what would be

true anyway — that the security for the faithful discharge of its fiduciary duty was the "capital stock, property and effects of the * * * corporation." Of course, such liability would arise only in the event of a breach of duty determined by the standard applicable to an individual trustee.

The foregoing language was, from time to time, transferred from place to place. The last cited statute (Laws of 1887, chap. 546) was repealed and a new Consolidated Banking Law enacted by chapter 689 of the Laws of 1892. Section 26 of the old statute was carried unchanged into the new act as section 158, with the heading "No security required; trust fund debts preferred," following which was a provision that a trust company need not furnish a bond. An addition was then had to the language of section 158 by chapter 696 of the Laws of 1893. The addition followed the provision that no bond should be required and that all investments "shall be at its [trust company's] sole risk * * * *unless* the investments are such as the courts recognize as proper when made by an individual acting as trustee, executor, administrator, guardian, receiver, committee or depositary, or such as are permitted in and by the instrument or words creating or defining the trust."

This was merely a statutory declaration of the standard of duty already exacted of a corporate trustee under the cases with a statutory declaration of guaranty imposed by the cases when a corporate trustee invested in securities not legal for an individual trustee or not authorized by the trust instrument. An individual trustee would in effect become a guarantor at the option of a *cestui que trust*, if he invested in similar unauthorized securities.

The section was again amended by chapter 98 of the Laws of 1898, in an immaterial particular, and in 1909 was carried into the Banking Law by chapter 2 of the Consolidated Laws of that year. The section was there renumbered as section 190.

In 1914 a codification was had (Laws of 1914, chap. 369), and section 190 became section 188. In this enactment the powers and duties of trust companies when acting as fiduciaries were set forth in section 188 as now subdivided. The former section 190 was placed in subdivision 6 and subdivision 7 of section 188 without change. Subdivision 7 read:

"7. Investments. All investments of money received by any such corporation, and by any trust company chartered by special act, prior to May eighteen, eighteen hundred and ninety-two, as executor, administrator, guardian, personal or testamentary trustee, receiver, committee or depositary, *shall be at its sole risk*, and for all losses of such money the capital stock, property and effects of the corporation shall be absolutely liable, *unless the investments*

*are such as are proper when made by an individual acting as trustee,* executor, administrator, guardian, receiver, committee, depositary, or *such as are permitted in and by the instrument or words creating or defining the trust."*

Then, by chapter 385 of the Laws of 1917, subdivision 7 was re-enacted as it then read, with an addition authorizing a corporate trustee to invest in mortgage participations. It reads: "*Investments* in bond and mortgage *by any such corporation* as executor, administrator, guardian, personal or testamentary *trustee*, receiver, committee or depositary *may be made by apportioning to any estate or fund held by such corporation* in any of such capacities *a part interest in a bond and mortgage held by or in the name of such corporation, individually* or in any representative capacity, *and any such part interest may be repurchased* at its face value *by such corporation individually or in any representative capacity;* but such bond and mortgage shall be a legal investment for trustees under the laws of this State and the records of such corporation shall at all times show every interest in the said bond and mortgage and any part interest in such bond and mortgage so apportioned shall at all times be and remain at least equal in lien to any other interest therein and such corporation shall promptly notify each person of full age and sound mind entitled to the income therefrom of the fact that such investment has been made. Any moneys of any such estate or fund awaiting investment or distribution *may be held* on deposit by such corporation *in its own name*, subject to the provisions of subdivision eleven [concerns interest payments] of this section; provided that appropriate entries showing the share or interest of each such estate or fund in the moneys so held on deposit shall, at all times, appear upon the records of such corporation."

These two sentences form the first paragraph of subdivision 7. Further additions by amendment were later had. They are not pertinent to determine the meaning of the phrase " shall be at its sole risk " contained in the first sentence.

The effect of the 1893 amendment, as above stated, is decisive of this phase of the case. Here decedent did not limit the trustee to legal investments; hence investing in mortgage participations did not make the corporate trustee a guarantor. This is so apart from the statutory provision added in 1917, permitting a corporate trustee to make such investments.

If decedent had not authorized investment in so-called " nonlegals," on a narrow or literal reading of 1893 and 1917 amendments the corporate trustee might be held as a guarantor of certain kinds of mortgage participations which did not come within the

rule of *Matter of Union Trust Company (supra)*, although it complied with the 1917 amendment of subdivision 7. This, because relief from the " sole risk " clause would then arise only if the investment was legal for an individual trustee. Mortgage participations, as distinguished from so-called guaranteed certificates, are not legal for individual trustees except as they come within *Matter of Union Trust Company (supra)*. Yet a broad interpretation of these statutes in furtherance of legislative purpose would sanction investment in mortgage participations by a corporate trustee confined to legals by the trust instrument, where the trustee conformed to the requirements of subdivision 7 of section 188. We need not forecast decision of this question. It is not here because of decedent's authorization to the corporate trustee.

Analysis and statutory history, therefore, plainly reveal that the phrase " at its sole risk " in the first sentence of subdivision 7 is merely a statutory substitution of a corporate trustee's assets for the ordinary requirement of an individual trustee in respect of a bond, and (except in a limited degree) discover that the legislative purpose was not to make a corporate fiduciary an insurer and guarantor of its investments, where it invested, as here, in securities permitted by the trust instrument or in securities in which an individual trustee may lawfully invest.

As the corporate trustee was free to invest in mortgage participations under the trust instrument, it was authorized to deal with itself, in a limited way, in good faith, under subdivision 7 of section 188 of the Banking Law (1917 amendment).

When section 188 of the Banking Law was amended from time to time, the Decedent Estate Law, section 111, and the Personal Property Law, section 21 — identical in substance — were amended. These sections specified the securities available to a trustee or similar person. They both contained the phrase " but no trustee shall purchase securities *hereunder* from himself." Those sections were amended in particulars not here pertinent. (Laws of 1918, chap. 544; Laws of 1922, chap. 599; Laws of 1925, chap. 604; Laws of 1926, chap. 307; Laws of 1928, chap. 362; Laws of 1932, chap. 623.)

They were again amended by chapters 320 and 321 of the Laws of 1933 at a time when subdivision 7 of section 188 of the Banking Law was amended by chapter 323 of the Laws of 1933.

All three amendments took effect April 21, 1933. The Banking Law amendment specified means of taking care of mortgage participations and certificates under the present economic conditions. The Personal Property Law, section 21, and the Decedent Estate Law, section 111, were likewise amended to care for similar

investments in foreclosure and in need of adjustment because of present economic distress.

While section 21 of the Personal Property Law and section 111 of the Decedent Estate Law under these amendments continued to carry the phrase " no trustee shall purchase securities *hereunder* from himself," the Banking Law amendment of subdivision 7 of section 188 did not contain the foregoing phrase, although enacted the same day.   The amendment of the Banking Law by chapter 323 was the last enactment of these three chapters.

The prohibition, therefore, in the two other statutes does not apply to a corporate trustee who does not act *under* them but acts under the Banking Law.   It applies only to an individual trustee who necessarily acts under the Personal Property Law and the Decedent Estate Law and is subject to this clause forbidding him to purchase securities " hereunder " from himself, and is in harmony with general doctrine.

The wisdom of applying a different rule in respect of legal investments, as between a corporate trustee and an individual trustee, is a matter for the Legislature.   Likewise, the wisdom of authorizing a corporate trustee to place trust funds in mortgage participations under the statutory procedure is a legislative and not a judicial question.

The statutes leave untouched the obligation of a trustee to act with prudence, foresight and vigilance and without negligence in making investments.   (*Matter of Cady*, 211 App. Div. 373, 375.) Whether or not a corporate trustee is negligent is to be determined under the ordinary rule of duty of an individual trustee.

Here the corporate trustee was not limited to so-called legal investments, yet invested in a form of security, surrounded by statutory safeguards, that had been made a legal investment for a *corporate* trustee.   This did not absolve it from the rule that it must exercise prudence, foresight and good faith, and refrain from negligent acts of commission or omission.   (*Durant* v. *Crowley*, 197 App. Div. 540; affd., 234 N. Y. 581; *Matter of Randolph*, 134 N. Y. Supp. 1117; affd., 150 App. Div. 902.)

In determining whether that which the corporate trustee did here was imprudent or negligent, the time as of which the trustee may be judged is important.

We said in *Matter of Andrews* (239 App. Div. 32, 36): " We must view the executors' acts by a standard long relied on, that is, we must ' look at the facts as they exist at the time of their occurrence, not aided or enlightened by those which subsequently take place.' (PECKHAM, J., in *Purdy* v. *Lynch*, 145 N. Y. 462, 475.)   The situation is to be adjudged not in retrospect but in prospect.   Even

the witless fool may pose as a paragon of wisdom after the unforeseeable disaster has occurred."

The dates when the investments were made or extended have been indicated. They were all during a ten-year period prior to May, 1931. During that period such investments were readily salable and transferable from one trust fund to another. Normal market conditions prevailed. The stagnant situation in real property securities did not set in until after the trustee had acted, either by purchasing or giving extensions. The trustee assumed that these securities would be as readily salable and transferable later to other trust funds as they were when the purchases were made. The experience over the prior period of ten years justified that assumption. The stock market upheaval of November, 1929, did not immediately affect the real estate mortgage market. The stock market crash in fact caused a movement of funds into first mortgages. The repercussions, however, of the crash caused conditions to ensue which finally did affect mortgage securities. They revealed their effect in the latter half of 1931 — becoming more acute in 1932. The continuance of the business depression brought in its train defaults in the payment of taxes on property and interest on mortgages, with a consequence that mortgages took on a congealed or frozen condition such as exists in the securities of this trust fund.

The rule in respect of the duty of a trustee is to keep funds in a state of security, productive of interest and subject to future recall. (*King* v. *Talbot, supra.*) It is unquestioned that the funds here were in a state of security for the ten years prior to May, 1931, when the last purchase was made, and the findings indicate that they were continuously productive of interest at a net rate in excess of five per cent; and, adjudged as of the date of purchase or extension of maturity date, they were subject to future recall. During 1930 and 1931 and later the air was filled with assurances from economic, financial and governmental authorities, seemingly respectable, trustworthy and sound and properly deemed to be well informed.

The law is not unmindful of common knowledge. Conservative men of sound discretion in managing their own affairs with what then seemed prudence and foresight during this period have had experiences similar to that of the trustee here. The law is reasonable in its exactions. The law does not exact prescience of a trustee. The disaster or stagnancy which befell these securities in 1933 is chargeable, therefore, to conditions arising subsequent to the early part of 1931, when the trustee acted. Adjudging the trustee's acts in prospect as of the early part of 1931 and prior thereto,

there is revealed on this phase no want of prudence, in view of conditions then prevailing. Consequently, action or inaction being free from fault by the criteria of the cases, no burden of liability founded solely upon the effect of the present economic conditions may be imposed upon the trustee. (*Matter of Clark*, 257 N. Y. 132.)

It is insisted that investing in mortgage participations put the funds in a form that was not subject to future recall, for two reasons: *One*, that, as it afterward developed, when economic conditions took on a greater degree of abnormality, from the end of 1931 on, the securities were not readily salable; and, *two*, the due dates of some of the securities extended beyond the date for the turning over of the trust fund. So far as lack of liquidity grew out of abnormal or distressful economic conditions, objections may not be sustained. So far as the due dates being beyond the date when the trust estate ended, a different question is presented.

All the securities, except two, had become due in fact at the time the accounting was had in January, 1933. The due dates of these two items, aggregating $5,000, grew out of purchases prior to the onset of abnormal economic conditions in real property mortgages. These purchases were not made a few months before the date for turning over the trust fund under the will. We have held that it is not negligent for a fiduciary to invest in a security maturing beyond the date when the turning over of the funds was required. (*Marczak* v. *Brooklyn City R. R. Co.*, 237 App. Div. 841; affd., 262 N. Y. 473; *Behrens* v. *Brooklyn City R. R. Co.*, 237 App. Div. 836.) In the *Marczak* case the security did not mature until over four years after the *cestui que trust* became of age. The investment, however, had been made when conditions were normal (April, 1927), nearly five years before the infant reached his majority.

*Matter of Blake* (146 Misc. 780) is cited to sustain a contrary view. It is not necessary to pass on the question there involved. It differs from that here presented. There the purchase of securities with a due date beyond the termination of the trust occurred a comparatively short time before the termination of the trust. It may be that a finding of imprudence or negligence is permissible as a fact where the date of maturity is beyond the termination of the trust if the investment is made " within a very brief space of time " before the date when payment over is necessary. (*Matter of Guenard*, 149 Misc. 182.) But that question is not before us. Here the securities with due dates beyond the termination of the trust were purchased many years prior to that date, when such securities were readily salable and transferable for face value.

It is further urged that imprudence or negligence is present because of a claimed ack of diversity in the investments in this fund. A partiality for first mortgage securities on a sound value basis has never been deemed an imprudent thing. The method of investment here involved diversity. The allotting of relatively small portions of the trust fund to different mortgages gave diversity, and the division of a $45,000 fund so as to spread it over eleven different properties may not be said to be imprudent for want of diversity. We do not have here the investment of the whole or greater part of a trust fund in a single property, coupled with other elements of hazard, which sustained a finding of imprudence or negligence because of undue concentration. (*Durant* v. *Crowley*, 197 App. Div. 540; affd., 234 N. Y. 581.)

The surcharging of this trustee, we conclude, was error.

This leaves one minor question respecting commissions of the trustee. It was entitled to them. (*Matter of Schliemann*, 259 N. Y. 497.)

The decree of the Surrogate's Court of Westchester county should be reversed on the law and the facts, with costs to the appellant, payable out of the estate, and the matter remitted to that court to dismiss the objections and settle the account as filed, after awarding the trustee its commissions and reimbursement for expense of the litigation, to be paid by the estate.

Lazansky, P. J., Young, Kapper and Davis, JJ., concur.

Decree of the Surrogate's Court of Westchester county reversed on the law and the facts, with costs to the appellant, payable out of the estate, and the matter remitted to that court to dismiss the objections and settle the account as filed, after awarding the trustee its commissions and reimbursement for expenses of the litigation, to be paid by the estate.